IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:24-CR-19-KAC-JEM |
| | ) | |
| TODD M. EVANS, | ) | |
| JOSHUA M. VANRIETTE, and | ) | |
| HENRI L. EWING, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions are referred to the undersigned for disposition or recommendation as appropriate. See 28 U.S.C. § 636(b). This case is before the undersigned on a motion by Defendant Todd Evans to suppress intercepted communications seized pursuant to the execution of a wiretap [Doc. 248]. Defendants Joshua Vanriette [Doc. 261] and Henri Ewing [Doc. 267] ask to join in this motion.

Defendants Evans, Vanriette, and Ewing are charged, along with twelve named codefendants and unnamed others, with conspiring to distribute fentanyl from December 1, 2021, through February 21, 2024 (Count One) [Doc. 3 pp. 1–2]. Defendants Evans and Ewing are charged with conspiring to distribute 50 grams or more of methamphetamine during that same period (Count Three) [*Id.* at 3]. Defendants Evans and Vanriette are charged in conspiracies to distribute 500 grams or more of cocaine (Count Two) and to commit money laundering (Count Four) also during December 1, 2021, through February 21, 2024 [*Id.* at 3–4]. Defendants Evans and Vanriette are charged with distributing fentanyl on February 9, 2024 (Count Five) [*Id.* at 4]. Defendant Ewing is charged with distributing methamphetamine (Count Eleven),

fentanyl (Count Twelve), and cocaine (Count Thirteen) all on June 27, 2023 [*Id.* at 6–7]. Finally, the Indictment charges firearms offenses against Defendants Evans (Counts Six and Seven), Vanriette (Counts Six and Eight), and Ewing (Counts Fourteen and Fifteen) [*Id.* at 5, 7–8].

While investigating a drug trafficking organization ("DTO") headed by Defendant Evans, Federal Bureau of Investigation ("FBI") Task Force Officer ("TFO") Kristopher Mynatt sought and obtained wiretaps on three telephone numbers used by Evans. Defendants ask to suppress the communications intercepted in these wiretaps, arguing that TFO Mynatt's affidavits failed to disclose that a confidential source was on state probation and failed to show that a wiretap was necessary to advance the investigation.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned recommends that Defendant Vanriette be permitted to join in Defendant Evans's motion to suppress but that Defendant Ewing's motion to join be denied because he is not a statutorily recognized "aggrieved person." The undersigned also recommends that the District Judge deny the motion to suppress the intercepted communications because TFO Mynatt's affidavits provide probable cause that the intercepted communications will contain evidence of drug trafficking and demonstrate the necessity of a wiretap.

## I.     BACKGROUND AND EVIDENCE

In 2022, law enforcement began investigating a drug trafficking organization led by Todd Evans [Doc. 263-1, Affidavit of Task Force Officer Kristopher L. Mynatt, ¶ 7]. On December 5, 2023, TFO Kristopher Mynatt submitted an affidavit in support of an application for a Title III Wiretap for Defendant Evans's cellular telephone number ending in 6256 ("Target Telephone #1" or "TT-1") and Defendant Evans's cellular telephone number ending in 7219 ("Target Telephone

2

"#2" or "TT-2") [No. 3:23-mc-74-KAC-JEM, Doc. 2 ("Exhibit 1")].[1] The District Judge granted

the application for a wiretap for TT-1 and TT-2 on that same day [No. 3:23-mc-74-KAC-JEM,

Doc. 3].

In the affidavit, TFO Mynatt averred that probable cause exists to believe that the requested

thirty-day interception of calls on TT-1 and TT-2 will reveal the communications of Todd Evans,

Joshua Vanriette, and others[2] and provide evidence of drug trafficking including evidence of

sources of supply and significant customers [Exh. 1 ¶¶ 9, 12(a)–(b), & 73]. The affidavit describes

information from, telephone calls and texts involving, and controlled drug purchases by a

confidential source ("CHS-1") [*Id.* ¶¶ 18–19, 21, 26, 34–52 & 54]. TFO Mynatt stated that

CHS-1 has provided reliable information to the FBI since April 2023, previously received

consideration on a pending state charge, has a 2018 state felony conviction for possession with

intent to sell Schedule II controlled substances and a 2020 state conviction for possession of

Schedule I controlled substances, and is currently cooperating with the FBI for monetary

compensation [*Id.* ¶ 35(a)–(b)]. According to the affidavit, law enforcement has never found

CHS-1 "to be false or misleading" [*Id.* ¶ 35(c)]. TFO Mynatt stated that he has "corroborate[d]

---

[1]     At the September 3, 2024 evidentiary hearing, the Government asked the Court to review
the sealed affidavit in the miscellaneous case in which it is docketed, rather than entering the
affidavit as a sealed exhibit in this case. Defendants did not object, and the undersigned granted
that request. Upon review of the miscellaneous case, the undersigned found that District Judge
Katherine A. Crytzer had previously unsealed miscellaneous case number 3:23-mc-74 upon the
Government's motion on March 8, 2024 [No. 3:23-CR-74, Doc. 9]. For ease of citation, the
undersigned will refer to TFO Mynatt's affidavit for the first wiretap in this case as Exhibit 1 to
the September 3, 2024 evidentiary hearing.

[2]     Defendant Ewing is not listed as a "Target Interceptee," which is a person from whom
communications are expected, but is listed as a member of the DTO and a "Target Subject"
[Exh. 1 ¶¶ 11(a), 12(a), & 16(q)].

3

most of CHS-1's information through independent investigation, including physical surveillance, consensually recorded calls, and controlled transactions" [*Id*. ¶ 35(d)].

TFO Mynatt also alleged that "normal investigative techniques have been tried and have failed to fully achieve all the goals and objectives of this investigation, or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried" [*Id*. ¶ 76]. According to TFO Mynatt, the techniques used or considered thus far in the investigation are use of confidential informants and controlled buys, physical surveillance, use of undercover agents, search warrants, interviews, grand jury subpoenas, offering immunity to associates, trash searches, covert surveillance cameras such as pole cameras, vehicle tracking devices, real-time location information for cellular telephones, pen registers/toll analysis and trap and trace devices, subscriber information, investigation of financial records, and mail cover surveys (examining data on the outside of mail) [*Id*. ¶¶ 77–106]. TFO Mynatt discussed the shortcomings of each of these techniques in relation to achieving the goals and objectives of the investigation [*Id*.]. He related that physical surveillance of this DTO is particularly challenging because they use multiple locations for drug trafficking and storage [*Id*. ¶¶ 81–82]. According to TFO Mynatt, after law enforcement surveilled Evans, Vanriette, and other members of the DTO meeting in the driveway of a residence on Post Oak Valley Road several times early in the investigation, Evans told CHS-1 that Walden (another Target Subject) thought she saw police SUVs around that residence [*Id*. ¶ 82]. After that conversation, law enforcement did not see Evans, Vanriette, or Evans's girlfriend Amber Jackson at that location again [*Id*.].

On December 8, 2023, TFO Mynatt submitted an affidavit in support of a second application for a Title III Wiretap for TT-2 ending in 7219 [No. 3:23-mc-76-KAC-JEM, Doc. 2

("Exhibit 2")].[3] The affidavit explains that interception began on TT-1 pursuant to the December 5 wiretap authorization yielding "a significant percentage of [] calls that were criminal in nature and pertained directly to the drug trafficking activity under investigation" [Exh. 2 ¶¶ 6 n.1 & 8]. TFO Mynatt stated that interception could not begin, however, on TT-2 because the IMSI number listed in the authorizing Order did not match the service provider's IMSI number associated with TT-2 [*Id*. ¶ 8]. TFO Mynatt said based on information from the service provider, the IMSI changed in October 2023 when Evans changed the handset that he uses with TT-2 [*Id*.]. TFO Mynatt stated that recent pen register data and geolocation data show that Evans is still using TT-2 even though the IMSI number has changed [*Id*.]. The affidavit again lists Evans and Vanriette as Target Interceptees [*id*. ¶ 13(a)] and Ewing as a Target Subject [*id*. ¶ 17(q)]. TFO Mynatt's second affidavit provides the same information about the reliability of CHS-1 and the shortcomings of other investigative techniques as his first affidavit [*Id*. ¶¶ 34–35 & 74–104]. The District Judge granted the second wiretap application on December 8, 2023, which is three days after she authorized the first wiretap [No. 3:23-mc-76-KAC-JEM, Doc. 3].

On January 5, 2024, TFO Mynatt submitted an affidavit in support of an application for a Title III Wiretap for a third telephone number used by Defendant Evans and ending in 4135 ("Target Telephone #3" or "TT-3") [No. 3:24-mc-3-KAC-JEM, Doc. 2 ("Exhibit 3")].[4] In this

---

[3]     Although the undersigned permitted review of TFO Mynatt's affidavit in support of the second wiretap in the miscellaneous case in which it is filed, the Court notes that miscellaneous case number 3:23-CR-76-KAC-JEM was also unsealed on March 8, 2024, by the District Judge at the Government's request [No. 3:23-mc-76-KAC-JEM, Doc. 9]. For ease of citation, the undersigned will refer to TFO Mynatt's affidavit for the second wiretap in this case as Exhibit 2 to the September 3, 2024 evidentiary hearing.

[4]     As with the affidavits for the first and second wiretaps, the undersigned granted the Government's request that the Court review the third affidavit filed in miscellaneous case number 3:24-CR-3-KAC-JEM. The District Judge granted the Government's motion to unseal this miscellaneous case on March 8, 2024 [No. 3:24-mc-3-KAC-JEM, Doc. 9]. For ease of citation,

affidavit, TFO Mynatt stated that as is common for drug traffickers, who change telephone numbers and cellular telephones frequently, Defendant Evans stopped using TT-1 and started using TT-3 on December 14, 2023 [Exh. 3 ¶ 6]. According to the third affidavit, Defendant Evans called CHS-1 on December 14, 2023, to advise that Evans had changed from TT-1 to TT-3 [*Id.* ¶¶ 67, 74 & 76]. TFO Mynatt's third affidavit again lists Evans and Vanriette as Target Interceptees [*id.* ¶ 14(a)] and Ewing as a Target Subject [*id.* ¶ 18(p)]. TFO Mynatt's third affidavit provides the same information about the reliability of CHS-1 and the shortcomings of other investigative techniques as his first affidavit but also adds why his opinion on the necessity of the wiretaps has not changed after the interceptions from TT-1 and TT-2 [*Id.* ¶¶ 35–36 & 90–133]. The District Judge granted the third wiretap application on January 5, 2024 [No. 3:24-mc-3-KAC-JEM, Doc. 3].

On July 29, 2024, Defendant Evans moved to suppress all statements and information obtained from the three wiretaps, arguing the supporting affidavits failed to disclose essential information on the reliability of the confidential informant and failed to demonstrate the necessity of the wiretap [Doc. 248]. Defendant Evans filed a sealed exhibit to his motion, containing information from the Tennessee Department of Corrections that CHS-1 began an eight-year sentence of probation on August 17, 2020, and that CHS-1's term of probation is projected to end on July 17, 2029 [Doc. 250-1, SEALED, pp. 1–2]. Defendant Vanriette moved to join in Defendant Evans's motion [Doc. 261]. Defendant Vanriette contends that he is an "aggrieved person" under 18 U.S.C. § 2518(11) because he is a person against whom an interception was directed [*Id.* at 2]. Defendant Ewing also moved to adopt Defendant Evans's motion, asserting that he agrees with

the undersigned will refer to TFO Mynatt's affidavit for the third wiretap in this case as Exhibit 3 to the September 3, 2024 evidentiary hearing.

Defendant Evans's position [Doc. 267 p. 1]. The Government responded in opposition, arguing that the District Judge had probable cause to issue the wiretaps [Doc. 264].

The parties appeared before the undersigned on September 3, 2024, for an evidentiary hearing on the motion. Assistant United States Attorney Brent N. Jones appeared on behalf of the Government. Attorney Christopher J. Oldham represented Defendant Evans. Attorney Michael P. McGovern represented Defendant Vanriette, and Attorney Michael Thomas Cabage represented Defendant Ewing. All three Defendants were also present.

The Government presented the testimony of FBI TFO Kristopher Mynatt, who stated that he works for the Roane County Sheriff's Office ("RCSO") and has served as a task force officer with the FBI for sixteen years. He is the lead case agent on the Evans DTO and prepared the affidavits for the three wiretap applications in this case and for search warrants for the residences at 521 Wheeler Street in Rockwood, Tennessee, and 128 Love Drive in Harriman, Tennessee. TFO Mynatt said this investigation started as a RCSO investigation, and a federal investigation began later, likely around April 2023. According to TFO Mynatt, CHS-1 served as an informant for the state investigation before working with the FBI beginning on April 25, 2023.

TFO Mynatt agreed that CHS-1 was on state probation at the time CHS-1 began working for the FBI. He said when taking on a new confidential informant for a state investigation, he will first seek approval from the district attorney and fill out the appropriate paperwork. He said he sometimes requests permission from the proposed informant's state probation officer based upon the recommendation of the district attorney. TFO Mynatt said CHS-1 began as a confidential informant for the RCSO and, at that time, law enforcement discussed CHS-1's suitability as a confidential informant with the district attorney because CHS-1 had pending charges.

7

TFO Mynatt also explained the process for accepting a new confidential informant on a federal case. He said if the person has information relevant and helpful to an FBI investigation, he also seeks federal approval and fills out paperwork. He said approval must be gained from both a squad supervisor and the confidential human source coordinator, who each vet the proposed informant. TFO Mynatt said during this process, he had several conversations with CHS-1's state probation officer, who was aware that CHS-1 was acting as a confidential informant.

TFO Mynatt acknowledged that he did not include the fact that CHS-1 was on state probation in his affidavits. He said he did not include this information because he did not think it was relevant to probable cause when the affidavits contained the fact that CHS-1 had state felony convictions and that law enforcement corroborated everything CHS-1 did.

TFO Mynatt also testified that he outlined the necessity for the wiretaps in his affidavits. He said in this case, law enforcement believed that the Evans DTO was sourcing their drugs from Detroit and wanted to identify the drug suppliers. He said they were also seeking to identify all the people involved in the DTO and to gain evidence to prosecute them successfully. TFO Mynatt agreed that law enforcement had employed several techniques to try to identify the sources of supply for the Evans DTO but was "striking out." He agreed that he believed interceptions of communications would help identify those sources of supply.

On cross-examination by Mr. Oldham, TFO Mynatt agreed that at the time he sought to bring CHS-1 into the federal investigation, he knew that CHS-1 had a prior conviction for methamphetamine and that CHS-1 was on state probation. He said he had several telephone conversations with CHS-1's probation officer but did not document these conversations or receive any documentation. He agreed that documentation would have been prudent. TFO Mynatt stated that when CHS-1 was acting as an informant for the RCSO, he was cooperating to "work off" a

Roane County charge for manufacture, sale, and delivery of methamphetamine. TFO Mynatt agreed that the sentence for a second methamphetamine conviction would have likely been more serious than that CHS-1 received for his first methamphetamine conviction. He said that when CHS-1 was hired as an FBI confidential informant, he was not doing so for assistance on a pending charge.

TFO Mynatt acknowledged that CHS-1 was currently in jail for a probation violation for failure to report to his probation officer. TFO Mynatt thought that CHS-1 received a new probation officer during the Evans DTO investigation, but that information was not communicated to CHS-1. According to TFO Mynatt, when CHS-1 was arrested for a driving offense, his new probation officer realized that CHS-1 had not been reporting as required.

TFO Mynatt disagreed that CHS-1 was committing crimes by participating in controlled buys. He said that this otherwise illegal activity was not illegal because CHS-1 engaged in the controlled buys at the request of the FBI for the purpose of collecting evidence in the investigation. TFO Mynatt stated that while the controlled buys would have been illegal if CHS-1 had engaged in them on his own, they were not illegal when done at law enforcement's behest. He agreed that in essence the arrangement with CHS-1 was an agreement not to prosecute otherwise illegal acts. TFO Mynatt said based upon pen registers in place at the time, law enforcement had no evidence that CHS-1 was seeking drugs from the DTO outside of the controlled buys. He said CHS-1 only contacted Defendant Evans's cell phone when law enforcement asked him to reach out to Defendant Evans. TFO Mynatt acknowledged that CHS-1 could have used someone else's cell phone to contact Defendant Evans. He doubted this occurred, however, because the controlled buys were recorded, and Defendant Evans or others in the DTO could have mentioned any illicit sales during the recorded controlled buys.

TFO Mynatt denied that information on CHS-1's state probation would have assisted the reviewing judge because he provided information on CHS-1's felony convictions in 2018 and 2020 in the affidavits. He said the judge would be aware that law enforcement was asking CHS-1 to participate in activity that would otherwise be illegal. TFO Mynatt also testified that he provided CHS-1's prior convictions to permit the reviewing judge to evaluate CHS-1's credibility. TFO Mynatt noted that the affidavits also contained information on the ways in which law enforcement corroborated CHS-1. He believed that information regarding CHS-1's sentence did not add anything.

TFO Mynatt agreed that prior to the wiretap interceptions in this case, law enforcement knew Misty Walden and others were customers of the DTO, but he said they did not know whether the customers were purchasing drugs for their own use or for resale. He agreed that some participants were known to be drug dealers either from controlled buys in this case or from prior investigations. TFO Mynatt also acknowledged that the wiretap affidavits list two people, one from Middle Tennessee and one from Michigan, whom he believed were sources of supply for the Evans DTO. He agreed that at the time he sought the wiretaps, law enforcement was tracking Defendant Evans's movements pursuant to a geolocation warrant and had installed a pole camera at Evans's Love Drive residence. He also confirmed that through the geolocation warrant, law enforcement knew when Defendant Evans was going to Detroit, Michigan, and Monterrey, Tennessee.

TFO Mynatt testified that through pen registers, law enforcement knew that Defendant Evans was communicating with suspected suppliers in Middle Tennessee and Detroit. TFO Mynatt explained law enforcement could only speculate about the purpose of Defendant Evans's meetings and communications with the suspected suppliers, and they needed the wiretaps to learn what those meetings were about. TFO Mynatt recalled that an individual came from Michigan to Defendant

10

Evans's residence in Roane County, carried luggage into Evans's house, and came out a few minutes later, placing the luggage back into his vehicle. He agreed that this caused law enforcement to strongly suspect this individual was a source of supply for drugs. He said law enforcement had several conversations with Michigan officers about the suspected source, but he did not recall when these conversations occurred in relation to the wiretaps. TFO Mynatt said that suspected source was arrested in Michigan and was in jail for most if not all the time the wiretaps were in place, causing law enforcement to believe that individual was no longer the source of supply.

TFO Mynatt said law enforcement performed some physical surveillance by following the DTO participants in vehicles. He stated, however, that law enforcement "got burned" at a location involving a trailer residence with a long driveway, and Defendant Evans became suspicious that he was being followed. TFO Mynatt said after that incident, Defendant went to Michigan for a couple of weeks, which made law enforcement reluctant to conduct more physical surveillance using vehicles. He said Roane County is a small area with little traffic making it difficult to follow someone without being noticed. TFO Mynatt said the members of the DTO went to remote locations, and if they saw unknown vehicles in these remote locations, the members of the DTO would be alerted to the fact that they were being followed.

TFO Mynatt said law enforcement also attempted to use aerial surveillance to monitor Defendant Evans's activities, but due to the unpredictable nature of Defendant Evans's method of dealing drugs, the plane became low on fuel before the suspected transaction occurred. He said that in a second attempt at aerial surveillance, the pilot became ill. TFO Mynatt said both ground and aerial attempts at physical surveillance were not worthwhile given the circumstances and

location in which the DTO operated. He also related that CHS-1 was the only confidential informant used in this investigation.

Following the parties' arguments, the undersigned took the motion under advisement.

## II. ANALYSIS

The Fourth Amendment protects citizens from unreasonable searches or seizures. U.S. Const. amend IV. Defendants Evans, Vanriette, and Ewing challenge the authorization of wiretaps to intercept communications on TT-1, TT-2, and TT-3, arguing that the affidavits in support of the wiretaps failed to provide information necessary to evaluate the credibility of the confidential informant and failed to establish the wiretaps were necessary to advance the investigation [Doc. 248 pp. 1, 5].

Law enforcement may apply for authorization to intercept electronic and oral communications pursuant to the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–23. *United States v. Turner*, Nos. 22-5046/5107/5131/5681/6056, 2024 WL 3634454, at *2 (6th Cir. Aug. 2, 2024). "The statute permits a federal judge to issue a wiretap order if the government establishes: (1) probable cause to believe that the targeted individual engaged or will engage in criminal activity; (2) that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous'; and (3) the wiretap application includes 'a full and complete statement' in that regard." *Id*. (quoting 18 U.S.C. §§ 2518(3)(a), (c), (1)(c)). In reviewing the sufficiency of probable cause in a wiretap affidavit, the Court "appl[ies] a similar standard to that used to evaluate search warrants." *Id*. (citing *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988)). And, as with search warrants, "great deference" is accorded the issuing judge's finding of probable cause to issue the intercept order. *Id*. (citing *Alfano*, 838 F.2d at 162).

12

Probable cause for a wiretap intercept order is determined by reviewing the affidavit based "'[up]on the totality of the circumstances and in a reasonable and common sense manner.'" *Turner*, 2024 WL 3634454, at *2 (quoting *Alfano*, 838 F.2d at 161). "Probable cause is 'is not a high bar.'" *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Instead, probable cause amounts to "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Here, Defendants challenge both the probable cause and necessity showing in TFO Mynatt's affidavits. A showing of necessity requires that law enforcement make "'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Turner*, 2024 WL 3634454, at *3 (quoting 18 U.S.C. § 2518(1)(c)). The purpose of the necessity requirement is to prevent federal officers from employing an invasive wiretap when traditional investigative techniques are sufficient to reveal criminal activity. *Id*. (citing *United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017)). In showing necessity, "the government 'is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted'; rather, the government must have given 'serious consideration' to traditional investigative techniques and then explain their inadequacies." *Id*. (quoting *Alfano*, 838 F.2d at 163 (citations omitted)).

With these principles in mind, the undersigned first examines whether Defendants Vanriette and Ewing may properly join in Defendant Evans's suppression motion, and then turns

to whether the affidavits establish probable cause and necessity. Based upon the undersigned's review of the exhibits, arguments, and relevant law, the wiretap authorization orders in this case comply with the Fourth Amendment and the statute.

### A. Standing

Only an "aggrieved person" may move to suppress communications intercepted pursuant to a judicially authorized wiretap. 18 U.S.C. § 2518(10)(a). An "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom an interception was directed." 18 U.S.C. § 2510(11). Here, the wiretaps were for three telephone numbers used by Defendant Evans, who is a person against whom the interception was directed.

Defendant Vanriette contends that he an aggrieved person because he also was a target of the intercepted communications [Doc. 261 p. 2]. TFO Mynatt's affidavits list Defendant Vanriette as a Target Interceptee, and, as such, he is an aggrieved person with standing to join in Defendant Evans's motion.

At the September 3 hearing, counsel for Defendant Ewing asserted that his client properly joins in this motion because law enforcement intercepted his communications with Defendant Evans on the wiretaps. AUSA Jones responded that he understood that law enforcement did not intercept any communications between Defendants Evans and Ewing on the wiretap. AUSA Jones, however, acknowledged that as a charged coconspirator, Defendant Ewing is potentially liable for the acts of other coconspirators and thus, has an interest in the suppression motion. In reply, Mr. Cabage agreed that he misspoke and that Defendant Ewing's standing comes not from intercepted communications, "it's just in the application itself[.]"

Defendant Ewing has the burden of demonstrating his standing to join in Defendant Evans's motion. *See United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022) (explaining that "standing is 'an element' of a Fourth Amendment suppression claim" and a "defendant bears the 'burden' of showing he has standing" (citation omitted)). The record is devoid of evidence of intercepted communications between Defendants Ewing and Evans.[5] While all three affidavits list Defendant Ewing as a Target Subject, none identify him as a person against whom the interceptions are directed (i.e., a Target Interceptee). *See United States v. Wright*, 635 F. App'x 162, 170 (6th Cir. 2015) (finding no standing when the wiretap did not intercept defendant's conversations, apply to his telephone, or even mention him as being a target of the investigation). A Target Interceptee is defined as a person for whom probable cause exists to believe their communications will be intercepted on the wiretap [Exh. 1 ¶ 12(a); Exh. 2 ¶ 13(a); Exh. 3 ¶ 14(a)]. A Target Subject, on the other hand, is a broader group with some connection to the DTO [Exh. 1 ¶ 16 & n.6; Exh. 2 ¶ 17 & n.6; Exh. 3 ¶ 18 & n.7]. Being a suspected member of the DTO alone is insufficient to confer standing. *See* 18 U.S.C. § 2510(11). Accordingly, the undersigned finds that Defendant Ewing is not an "aggrieved person" and that he lacks standing to join in Defendant Evans's suppression motion.

### B.      Probable Cause

The Defendants challenge the probable cause for issuance of the intercept orders, arguing that TFO Mynatt failed to include material information relating to the confidential informant's reliability and credibility [Doc. 248 p. 1]. Specifically, they argue that the affidavits do not inform

---

[5]      TFO Mynatt's affidavit for interception of TT-3 does not relate any communications between Defendant Evans and Defendant Ewing on TT-1 or TT-2 [*See* Exh. 3 ¶¶ 67–85]. Nor does TFO Mynatt's affidavit in support of the search of two residences mention any intercepted communications between Defendants Evans and Ewing [*See* Doc. 263-1].

15

the District Judge that CHS-1 was on state probation at the time of the controlled drug purchases alleged in the affidavits [*Id*. at 1, 3]. In support of this argument, they contend that internal Department of Justice ("DOJ") policies required TFO Mynatt to seek permission from CHS-1's supervising probation officer for him to engage in acts that would violate the terms of his probation [*Id*. at 2–5]. The Government responds that TFO Mynatt's affidavits show CHS-1 is reliable through corroboration and that the FBI complied with DOJ policy in using CHS-1 as a confidential informant [Doc. 264 pp. 3–4].

As with search warrant affidavits, the Court evaluates the sufficiency of an affidavit in support of a wiretap application based upon what it contains, rather than what it lacks. *United States v. Moore*, 999 F.3d 993, 998 (6th Cir. 2021) (citing *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 975 (2000)) (analyzing an affidavit in support of a search warrant); *Alfano*, 838 F.2d at 161 ("The basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III . . . ."). The reliability and basis of knowledge of a confidential informant are part of the totality of circumstances a court must consider in evaluating probable cause for a wiretap. *United States v. Dimora*, 836 F. Supp. 2d 534, 559 (N.D. Ohio 2011). The affiant may demonstrate the informant's reliability by stating that the informant has provided accurate information to law enforcement in the past. *Id*. at 560 (observing the affidavit stated that each informant "had never been found to be false or misleading"). Independent police corroboration of an informant also demonstrates reliability. *Id*. (noting that officers corroborated information from the two most significant informants through consensual recordings); *see also Moore*, 999 F.3d at 997–98 (holding that a single controlled buy by the informant corroborated the reliability and credibility of the informant in the search warrant affidavit).

TFO Mynatt's affidavits state that CHS-1 provided reliable information in the past to the RCSO before CHS-1 began working for the FBI [Exh. 1 ¶ 35; Exh. 2 ¶ 35; Exh. 3 ¶ 36]. The affidavits inform the District Judge that CHS-1 is a "previous drug abuser" and has state felony convictions for possession of controlled substances with intent to sell in 2018 and possession of controlled substances in 2020 [Exh. 1 ¶ 35(b); Exh. 2 ¶ 35(b); Exh. 3 ¶ 36(b)]. They state that CHS-1 is currently working for the FBI for "monetary compensation" [Exh. 1 ¶ 35(a); Exh. 2 ¶ 35(a); Exh. 3 ¶ 36(a)]. The affidavits detail that law enforcement corroborated CHS-1's information on the Evans DTO by checking "law enforcement data basis, physical surveillance, controlled drug purchases, toll/pen-trap records, and consensually recorded meetings, and phone calls and text messages that CHS-1 had with Evans" [Exh. 1 ¶ 35(c); Exh. 2 ¶ 35(c); Exh. 3 ¶ 36(c)]. TFO Mynatt states that "CHS-1's information has never been found by law enforcement to be false or misleading" [Exh. 1 ¶ 35(c); Exh. 2 ¶ 35(c); Exh. 3 ¶ 36(c)] and that he has "corroborate[d] most of CHS-1's information through independent investigation, including physical surveillance, consensually recorded calls, and controlled transactions" [Exh. 1 ¶ 35(d); Exh. 2 ¶ 35(d); Exh. 3 ¶ 36(d)]. This information amply demonstrates CHS-1's reliability.

Defendants argue that the failure to include CHS-1's status as a probationer is a material omission. But to pierce the affidavit and raise this *Franks*-type argument, Defendants must make a substantial preliminary showing that the affiant knowingly, intentionally, or with reckless disregard for the truth omitted a fact that is necessary to probable cause. *Wright*, 635 F. App'x at 169–70 (applying *Franks v. Delaware*, 438 U.S. 154 (1978), to an affidavit in support of a wiretap application). For an alleged material omission in a wiretap affidavit, "'the defendant [must] make[] a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit' in addition

to '(2) a finding [that] probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it.'" *United State v. Gonzalez*, 849 F. App'x 557, 563 (6th Cir. 2021) (quoting *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008)) (third alteration in original). This Defendants fail to do.

As discussed above, TFO Mynatt's affidavit contains information to support the reliability and credibility of CHS-1, without the omitted information that he was on state probation.[6] The affidavits contain information on police corroboration of the controlled buys to demonstrate CHS-1's reliability and provide information on CHS-1's prior drug-related convictions, as well as his prior drug abuse, to allow the District Judge to evaluate CHS-1's credibility. Moreover, the testimony of TFO Mynatt shows that he had no intent to deceive the issuing judge by omitting that CHS-1 was on probation.[7] Instead, he merely thought the information was unnecessary considering the information of CHS-1's prior convictions. In sum, the alleged omission is neither deliberately or recklessly made, nor material to probable cause.

TFO Mynatt's affidavits contain substantial information permitting the District Judge to evaluate the reliability and credibility of CHS-1. Defendants make no showing that CHS-1's probationary status is material to probable cause or was omitted from the affidavits for the purpose of misleading the District Judge. Thus, Defendants' arguments fail to demonstrate that TFO Mynatt's affidavits lack probable cause for the issuance of the intercept orders.

---

[6]     In oral argument, Mr. Oldham acknowledged that inclusion of CHS-1's probationary status likely may not have made a difference to the issuance of the wiretap.

[7]     Defendants' argument that TFO Mynatt violated DOJ policy because he had a duty to tell CHS-1's probation officer about his intended work as a confidential informant is both unavailing and inaccurate. First, defense counsel acknowledged in oral argument that the DOJ policy does not require TFO Mynatt to include information about CHS-1's probationary status in his affidavits. Second, TFO Mynatt testified that he was in contact with CHS-1's probation officer, who was aware that CHS-1 was cooperating with the FBI.

18

## C. Necessity

Defendants also challenge the necessity showing in the affidavits, arguing that TFO Mynatt's grounds demonstrate that a wiretap would make the investigation easier but do not show that interception of communications is necessary to further the investigation [Doc. 248 p. 5]. They contend that the techniques already in use by law enforcement were successful and would continue to assist in the investigation [*Id.*]. At the September 3 hearing, defense counsel argued that law enforcement should have explored other investigative techniques before resorting to a wiretap. For example, defense counsel asserted that officers should have attempted to "flip" lower-level coconspirators, that is to persuade a lower-level member of the DTO to cooperate to identify the suppliers and participants in the DTO.

As stated above, "a wiretap application must include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Gonzalez*, 849 F. App'x at 561 (quoting 18 U.S.C. § 2518(1)(c)). This requirement ensures that law enforcement does not seek a wiretap when "traditional investigative techniques would suffice to expose the crime." *Alfano*, 838 F.2d at 163 (citation omitted). "The necessity requirement does 'not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but [serves] simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *Gonzalez*, 849 App'x at 561 (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)) (alteration in original). A wiretap application must not be the first step in a criminal investigation, nor is it required to be the last. *Landmesser*, 553 F.2d at 20; *see also Gonzalez*, 849 App'x at 561. Instead, law enforcement's pursuit of a wiretap must follow serious consideration of other investigative techniques. *Gonzalez*, 849 App'x at 562 (citing *United*

19

*States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007)). And the supporting affidavit must reflect such consideration by applying the facts of the investigation at hand, rather than providing conclusory or general statements based upon the affiant's experience alone. *Rice*, 478 F.3d at 710 (citing *Landmesser*, 553 F.2d at 20).

Here, a wiretap was not law enforcement's first step. TFO Mynatt stated that the goal of the wiretap interceptions was to obtain sufficient evidence to prosecute Defendants Evans and Vanriette, all the members of the DTO, and their "sources of supply, significant customers, and all of their associates who perform drug trafficking, and/or other illegal activities at their direction" [Exh. 1 ¶ 73; Exh. 2 ¶ 71; Exh. 3 ¶ 87]. TFO Mynatt's affidavits reflect that law enforcement used multiple investigative techniques such as confidential informants, controlled drug purchases, pen registers and trap and trace devices, geolocation information, physical surveillance both in person and through a pole camera, and trash pulls prior to seeking a wiretap [Exh. 1 ¶¶ 18–72; Exh. 2 ¶¶ 18–69; Exh. 3 ¶¶ 19–66 & 84–85]. Moreover, TFO Mynatt's affidavits explain why these techniques and others have not been or would not be successful in identifying the drug suppliers and all the DTO members and customers [Exh. 1 ¶¶ 75–106; Exh. 2 ¶¶ 73–104; Exh. 3 ¶¶ 89–133]. TFO Mynatt also addresses why interceptions of communications on TT-3 are necessary despite the prior interceptions of communications on TT-1 and TT-2 [Exh. 3 ¶¶ 128–133].

TFO Mynatt explains the shortcomings of the various techniques in terms of the specific facts of this case. Regarding physical surveillance, he states that the DTO's use of multiple locations to sell and store drugs make physical surveillance difficult and likely to tip off the members of the DTO to the investigation [Exh. 1 ¶¶ 80–83; Exh. 2 ¶¶ 78–81; Exh. 3 ¶¶ 96–99].[8]

---

[8]     TFO Mynatt testified that the remote location and low population of the area in which the DTO conducted business made undetected physical surveillance more difficult. The undersigned does not consider this testimony because it is not contained within TFO Mynatt's affidavits.

20

He relates that Defendant Evans told the confidential informant that Misty Walden, a member of the DTO, thought she saw police SUV's near the Post Oak Valley Road residence [Exh. 1 ¶ 83; Exh. 2 ¶ 80; Exh. 3 ¶ 98]. TFO Mynatt said after that time, law enforcement never saw Defendants Evans, Vanriette, or Jackson near the Post Oak Valley Road address again [Exh. 1 ¶ 83; Exh. 2 ¶ 80; Exh. 3 ¶ 98].

Regarding the technique of seeking cooperation from (*i.e.*, "flipping") a lower-level coconspirator mentioned by defense counsel, TFO Mynatt opines that "interviews of Target Subjects or their known associates" would not yield information on the full extent of the DTO's suppliers, participants, and customers and would risk "compromising the investigation" and loss of evidence if the interviewees alerted other members of the DTO [Exh. 1 ¶¶ 86–88; Exh. 2 ¶¶ 84–86; Exh. 3 ¶¶104–106]. He states that while this technique may be appropriate closer to the end of the investigation such as when search warrants are executed, approaching members of the DTO at this stage risks "irreparable harm to the investigation[,] . . . thwart[ing the investigative goals[,] . . . [and] endanger[ing] CHS-1" [Exh. 1 ¶ 88; Exh. 2 ¶ 86; Exh. 3 ¶ 106]. Thus, TFO Mynatt fully considered this technique and presented the problems with it to the District Judge.

The undersigned finds that TFO Mynatt's affidavits make a "full and complete" showing of the necessity of the wiretaps. *See* 18 U.S.C. § 2518(1)(c).

## III.    CONCLUSION

For the reasons discussed herein, the undersigned finds:

1.    that Defendants Evans and Vanriette have standing to challenge the wiretaps as targets of the interceptions and that Defendant Ewing

---

*United States v. Brown*, No. 4:13-cr-11, 2014 WL 6674452, at *2 (E.D. Tenn. Nov. 19, 2014) (citing *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009)), *aff'd* 677 F. Appx. 247 (6th Cir. 2017). But if it were considered, it would only bolster the undersigned's findings and recommendation.

21

lacks standing because he is neither a target of the interceptions nor a person whose communications were intercepted;

2.     that TFO Mynatt's affidavits provide probable cause to authorize the interception of communications on TT-1, TT-2, and TT-3, notwithstanding that the affidavits do not mention that CHS-1 was on state probation; and

3.     that TFO Mynatt's affidavits make a full and complete showing of necessity for the interception of communications on TT-1, TT-2, and TT-3.

The undersigned therefore **RECOMMENDS**[9] that the District Judge **GRANT** Defendant Vanriette's motion to join [**Doc. 261**] in the suppression motion, **DENY** Defendant Ewing's motion to join [**Doc. 267**] the suppression motion, and **DENY** the Motion to Suppress Intercepted Communications by Wiretap [**Doc. 248**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[9]     Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs*, 829 F.2d 1370, 1373 (6th Cir. 1987).

22