UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:24-CR-19-KAC-JEM-1 |
| ) | |
| TODD EVANS, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**
**OVERRULING DEFENDANT'S OBJECTIONS AND ADOPTING REPORT**

This criminal action is before the Court on Defendant Joshua Vanriette's Objections to United States Magistrate Judge Jill E. McCook's November 26, 2024 "Report and Recommendation" ("Report"), [*see* Docs. 335, 354], which Codefendant Todd Evans joins, [*see* Doc. 355]. For the reasons below, the Court overrules Defendants' objections and accepts and adopts the Report.

**I.   Background**

In 2022, law enforcement began "investigat[ing] the illegal activities associated with" Defendant Evans "and his drug-trafficking organization" [Doc. 263-1 ¶ 7]. Law enforcement discovered that Defendants Evans, and others, resided in two (2) locations: 128 Love Drive, Harriman, Tennessee; and 521 West Wheeler Street, Rockwood, Tennessee [*Id.* ¶ 6(a)-(b)]. "In November of 2022," after conducting a controlled buy between a confidential source and Defendant Evans, "law enforcement followed" Defendant Evans "directly from the buy location to" 128 Love Drive [*Id.* ¶ 10]. From November 2022 through January 31, 2024, Defendants Evans and Vanriette participated in (14) controlled buys, at least seven (7) of which involved a combined approximately 280 grams of methamphetamine, heroin, fentanyl, and cocaine [*Id.* ¶¶ 21-29].

During surveillance of 128 Love Drive, law enforcement observed Defendants Evans and Vanriette turn a vehicle, which law enforcement believed Defendants used to traffic drugs, "around so that the front faced away from the road and toward the" residence [*Id.* ¶ 31]. Law enforcement further witnessed Defendants Evans and Vanriette "us[ing] handheld power tools" to "manipulate something under the hood in the [vehicle's] engine compartment" [*Id.*]. Law enforcement then observed Defendants Evans and Vanriette "carry items, of size and shape consistent with drug packages, from under the hood into" the 128 Love Drive residence "on multiple occasions" [*Id.*].

On May 10, May 24, and June 21, 2023, law enforcement searched trash outside of the 128 Love Drive residence [*Id.* ¶ 19]. Each time, law enforcement discovered items consistent with drug trafficking, such as "a used fentanyl test kit," powders and plastic bags labeled with common street names for drugs with residue that "tested positive" for methamphetamine and fentanyl, and cutting agents, among other things [*Id.*]. On December 11, 2023, law enforcement observed Defendants Evans and Vanriette drive to a coconspirator's residence after they agreed to deliver narcotics to the coconspirator [*Id.* ¶ 39]. Defendants arrived back at 128 Love Drive six (6) minutes after leaving the coconspirator's residence [*Id.*]. A similar series of events occurred on January 18, 2024, when Defendants Evans and Vanriette arrived back at 128 Love Drive four (4) minutes after leaving the same coconspirator's residence [*Id.* ¶ 41]. In the Affidavit submitted in support of the warrant to search the residences, Officer Mynatt asserted that based on his "training and experience, and [his] familiarity with" investigating Defendants Evans and Vanriette during the conspiracy, this behavior indicated that Defendants Evans and Vanriette stored drugs, instruments, and drug proceeds at 128 Love Drive [*Id.* ¶ 43].

On February 1, 2024, law enforcement observed Defendants Evans and Vanriette "load" a vehicle with "several bags from inside" the 521 West Wheeler Street location and leave the

2

Case 3:24-cr-00019-KAC-JEM   Document 381   Filed 01/16/25   Page 2 of 13
PageID #: 1516

residence [*Id.* ¶ 44]. Geolocation data tracked Defendants Evans and Vanriette as they traveled to Pontiac, Michigan [*Id.* ¶ 45]. On February 4, while in Michigan, Defendant Evans called a coconspirator [*Id.* ¶ 46]. While discussing that another coconspirator was "trying to get a hold of" Defendant Evans, Evans stated that when he returned from Michigan he was "going to have even stronger shit" [*Id.*]. Defendant Evans said he would return on February 5 [*See id.*]. On February 5, law enforcement observed Defendants Evans and Vanriette return to the 521 West Wheeler Street residence and carry multiple items inside, including bags and boxes [*Id.* ¶ 48]. The Affidavit maintains that based on Officer Mynatt's training, experience, and familiarity with this specific investigation, Defendants Evans and Vanriette traveled to Michigan to obtain drugs and returned to the 521 West Wheeler Street residence to store them [*Id.* ¶ 49]. Defendants Evans and Vanriette then traveled to Wal-Mart, where they purchased items that the Affidavit states are consistent with cutting drugs for distribution, including a Ninja brand blender, and brought these items back to the 521 West Wheeler Street residence [*Id.* ¶¶ 49, 50].

On February 5, law enforcement observed Defendants Evans and Vanriette arrive at the 128 Love Drive residence at approximately 1:48 p.m. [*Id.* ¶ 51]. Defendant Vanriette entered the residence and returned to the vehicle before Defendants Evans and Vanriette departed at 1:53 p.m. [*Id.*]. Six (6) minutes later, Defendants Evans and Vanriette arrived at a coconspirator's residence [*Id.*]. The coconspirator entered Defendants' vehicle and "remained for less than a minute before exiting and walking behind the residence" [*Id.*]. Defendants Evans and Vanriette left the coconspirator's residence "immediately after" the coconspirator "exited the vehicle" [*Id.*]. Officer Mynatt's Affidavit asserts that this conduct indicates that Defendants Evans and Vanriette and their coconspirator "complete[d] a drug transaction" [*Id.* ¶ 52].

3

On February 7, the United States applied for, and Judge McCook issued, a warrant to search both residences [Doc. 263-1]. The Application indicated that a search of both residences would uncover evidence of a conspiracy to distribute fentanyl and cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The warrant was executed. At the 128 Love Drive residence, law enforcement found plastic bags with possible drug residue, a plate with a razor blade and straw with possible drug traces, a plastic bag with a white crystal substance, other plastic bags with possible drug traces, and various firearms and ammunition [Doc. 263-2]. The 521 West Wheeler Street residence yielded "dark powder substance[s]," a Ninja blender with "suspected residue inside [the] blender," a "scale with possible residue," loaded firearms including a "polymer handgun," and ammunition [Doc. 263-3].

On February 21, a grand jury charged Defendant Evans and fifteen (15) other coconspirators, including Defendant Vanriette, with various offenses, including drug trafficking, money laundering, and firearm offenses [*See* Doc. 3, *sealed]. On July 23, Defendant Evans moved to suppress the evidence the United States obtained through the search of the residences at 128 Love Drive and 521 West Wheeler Street [Doc. 245]. Defendant Evans argued that the United States failed to establish a sufficient "nexus between the alleged drug activity and the residences" to justify searching either residence [*See* Doc. 245 at 10]. On August 12, Defendant Vanriette filed a Motion to join Defendant Evans's Motion to Suppress [*See* Doc. 260].

The Report, filed on November 26, recommends that the Court (1) grant Defendant Vanriette's Motion to join Defendant Evans's Motion to Suppress and (2) deny the Motion to Suppress [*See* Doc. 335 at 18]. On December 10, Defendant Vanriette filed the instant Objections, asserting that the Report erred in (1) finding that there was probable cause to search the residences and (2) applying the Good-Faith exception to the exclusionary rule [*See* Doc. 354].

Defendant Evans timely filed a "Notice of Joinder," indicating that he joined in Defendant Vanriette's Objections [Doc. 355]. On December 17, the United States disputed the Objections [Doc. 358].

II. <u>Analysis</u>

Under 28 U.S.C. § 636(b)(1), the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The Court considers timely objections under Section 636(b)(1)(C) and Federal Rule of Criminal Procedure 59(b) de novo. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim P. 59(b)(3). The Court, however, will not disturb a probable cause determination if the Court concludes that the issuing judge had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (citation omitted) (en banc).

**A. The Report Did Not Err In Concluding That A Sufficient Nexus Existed.**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. The Supreme Court has interpreted the Fourth Amendment's text to require a "probable cause nexus," a "phrase of art" reflecting "the requirement that an affidavit in support of a search warrant sufficiently show that" law enforcement will find "the specific things" it seeks "located on the property" it wants to search. *See Sanders*, 106 F.4th 460-61 (cleaned up). The question of whether probable cause exists is a "familiar one." *Id.* at 461. But the standard for probable cause is "incapable of precise definition or quantification." *Id.* (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Importantly, though, "probable cause is not a high bar." *Id.* (quotation omitted). Determining whether probable

5

cause exists is a "fact-intensive" inquiry, asking whether under the "totality of the circumstances" there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (citations omitted).

Probable cause to search a location may exist, for example, where officers observe "a person leave [that] location" and "soon find the individual possessing contraband" or "engaging in the sale of contraband." *Id.* at 462 (citation omitted). Probable cause may exist where an affidavit describes "a controlled purchase of contraband followed by the defendant returning to the location" law enforcement seeks to search. *Id.* This pattern "creat[es] a reasonable inference that the defendant took the proceeds with him." *Id.* "Yet another set of cases," known as the known drug dealer inference cases, "involve a search warrant affidavit that adequately establishes" probable cause for "where a defendant resides as well as the defendant's active engagement in certain criminal activity," such as drug dealing. *Id.* (citations omitted). "Many roads, in other words, can lead to a probable cause nexus." *Id.*

Here, Defendants Evans and Vanriette object to the Report's conclusion that there is sufficient evidence establishing a probable cause nexus between illegal activity and both residences on two (2) grounds. Defendants argue that (1) their "status as 'known drug dealers'" does not establish a probable cause nexus and (2) the totality of the circumstances does not support a probable cause nexus [Doc. 354 at 4-10]. Both arguments fail.

***First***, the United States Court of Appeals for the Sixth Circuit recently clarified "misunderstanding[s] of" its known drug dealer inference precedent. *Sanders*, 106 F.4th at 465. Those cases "involve a search warrant affidavit indicating that a drug dealer lives at a certain location" but the affidavit lacks "facts indicating that the defendant was dealing drugs from his residence." *Id.* at 465 (citation omitted). Because "drug dealers don't tend to work out of

6

Case 3:24-cr-00019-KAC-JEM    Document 381    Filed 01/16/25    Page 6 of 13
PageID #: 1520

office buildings," Sixth Circuit precedent "blesse[s] the inference that in the case of drug dealers, evidence [of drug dealing] is likely to be found where the dealers live." *Id.* (citation and quotation marks omitted). Law enforcement, however, does not satisfy their probable cause obligation simply by identifying "the home of someone connected to a drug trafficking crime." *Id.* at 466. Instead, to establish probable cause through the known drug dealer inference, an affidavit must show that a defendant lives in a particular residence and is engaged in "continual and ongoing [criminal] operations" *Id.* "[F]acts showing that" a defendant's "residence had been used in drug trafficking" is not "always necessary for application of" the known drug dealer inference. *See United States v. McCoy*, 905 F.3d 409, 417 (6th Cir. 2018) (citation omitted). Indeed, where there is evidence of an "ongoing course of unlawful conduct" it may be "reasonable to conclude that" a defendant "keeps evidence of his illegal scheme in his home." *Id.*

Here, the Report did not err in applying the known drug dealer inference to support a finding of probable cause. There is no dispute that Defendants Evans and Vanriette resided at the 128 Love Drive and 521 West Wheeler Street residences during the relevant timeframe [Doc. 335 at 12-13; *see also* Doc. 354 at 4]. And the Affidavit shows that Defendants Evans and Vanriette engaged in continual criminal activity up until mere days before the United States sought the warrant to search their residences. The Affidavit showed that Defendants Evans and Vanriette participated in fourteen (14) controlled buys spanning from the beginning of the investigation until roughly a week before law enforcement sought the warrant to search the residences on February 7, 2024, at least seven (7) of which involved a total of approximately 280 grams of methamphetamine, heroin, fentanyl, and cocaine [Doc. 263-1 ¶¶ 21-29]. And the May 10, May 24, and June 21, 2023, trash searches revealed earlier evidence of drug trafficking outside

7

the 128 Love Drive residence.[1] Still, there is more. On February 5, a mere two days before law enforcement officers sought the warrant, law enforcement observed Defendants travel from 128 Love Drive to a coconspirator's residence and engage in conduct consistent with drug trafficking [*Id.* ¶¶ 51-52]. The Affidavit thus included information that Defendants Evans and Vanriette resided at both residences and that they were engaged in an ongoing course of illegal activity. It was therefore "reasonable to conclude that" Defendants kept "evidence of [their] illegal scheme in [their] homes." *See McCoy*, 905 F.3d at 417 (citation omitted); *see also Sanders*, 106 F.4th at 465-66. The Report accurately applied the known drug dealer inference.

Defendants object that the known drug dealer inference does not apply here because there is allegedly no reliable "information that drugs or drug proceeds were sold out of either residence, or that drugs or drug proceeds were present in or near either house" [Doc. 354 at 5]. But the law does not require such a showing. *See McCoy*, 905 F.3d at 417. In fact, the Court may draw the known drug dealer inference, and conclude that there is probable cause to search a suspect's home, "with no facts indicating that the defendant was dealing drugs from his residence," so long as there is evidence of continual and ongoing criminal operations. *Id.* If Defendants' understanding of the law were correct, the known drug dealer inference would serve no purpose. Indeed, there would

---

[1] Defendants argue that the trash searches at the 128 Love Drive residence were stale and "stand-alone events" [Doc. 354 at 8]. But that assertion mischaracterizes the record. The three (3) trash searches spanned more than a month and were merely one part of a broader investigation into ongoing drug trafficking. Indeed, these trash searches, when considered in the context of the November 2022 controlled drug transaction where law enforcement followed Defendant Evans directly home, show ongoing criminal activity during a relevant timeframe. *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (citation omitted). And even if Defendant were correct that the evidence obtained from the trash pull was stale, there was sufficient independent evidence apart from the trash pull supporting the application of the known drug dealer inference and a finding of probable cause.

8

be no need for an "inference" that contraband is in a residence if there was already reliable evidence that drugs were sold out of the residence or that drugs or drug proceeds were at the residence.

*Second*, even presuming that the record did not support the known drug dealer inference, there is still sufficient evidence to support probable cause. Start with 128 Love Drive. Law enforcement followed Defendant Evans directly home after a controlled buy [Doc. 263-1 ¶ 10].[2] During surveillance of 128 Love Drive, law enforcement observed Defendants Evans and Vanriette (1) turn a vehicle "around so that the front faced away from the road and toward the" residence, (2) "use handheld power tools," to "manipulate something under the hood in the [vehicle's] engine compartment," and (3) "carry items, of size and shape consistent with drug packages, from under the hood into" the residence "on multiple occasions" [*Id.* ¶ 31]. On December 11, 2023, and January 18, 2024, law enforcement observed Defendants drive to a coconspirator's residence after Defendants agreed to deliver narcotics to the coconspirator and arrive back to 128 Love Drive six (6) minutes after leaving the coconspirator's residence in December and within four (4) minutes in January [*Id.* ¶¶ 39-41].[3]

Regarding the controlled buys, Defendants argue, in reliance on the *Sanders* dissent, that the Report erred by failing to "negate the inference that" Defendants "stopped at [other] locations, or met [other] persons, on their way back to their residences to drop off proceeds of the drug

---

[2] Defendants argue that the November 2022 controlled buy where agents followed Defendants directly home is stale [Doc. 354 at 6]. But this controlled buy was not an isolated event; it was part and parcel of ongoing criminal activity. And "[e]vidence of ongoing criminal activity" typically defeats a staleness claim. *Greene*, 250 F.3d at 481.

[3] In arguing that law enforcement failing to trail Defendants directly home after controlled buys prevents a court from finding probable cause, Defendants rely on *United States v. Miller*, 850 F. App'x 370, 374 (6th Cir. 2021). That reliance is misplaced. Not only is *Miller* a nonprecedential opinion, but *Miller* merely stated that "direct line" evidence was *sufficient* to establish probable cause, not that it was *necessary*. *Id.*

9

transaction" [Doc. 354 at 5-6]. Remember that two (2) of Defendants' trips from the coconspirator's residence back to their residence only took six (6) and four (4) minutes respectively. An "issuing judge need not eliminate every alternative explanation to find a 'fair probability' that contraband will be present" in a particular location. *Sanders*, 106 F.4th at 461 (quoting *United States v. White*, 990 F.3d 488, 490 (6th Cir. 2021)). Probable cause requires a fair *probability*, not the elimination of every other *possibility*.

There is sufficient evidence supporting probable cause regarding the 521 West Wheeler Street residence, too. Law enforcement provided evidence that Defendants Evans and Vanriette "load[ed] several bags from inside" the 521 West Wheeler Street location into a car, left the residence, and traveled in that car to Pontiac, Michigan [*Id.* ¶ 44-45]. While there, Defendant Evans called a fellow coconspirator and told the coconspirator that he was "going to have even stronger shit" when he returned [*Id.* ¶ 46]. And when Defendants Evans and Vanriette returned to the 521 West Wheeler Street residence the next day, law enforcement observed them carrying multiple items into the residence, including bags and boxes, suggesting that they traveled to Michigan to obtain drugs and returned to the 521 West Wheeler Street residence, storing drugs there [*Id.* ¶¶ 48, 49]. Defendants then traveled to Wal-Mart, where they purchased items consistent with cutting drugs for distribution [*Id.* ¶ 50].

Taken together, the evidence clears the low probable cause bar because, based on the "totality of the circumstances," there was a "fair probability" that officers would discover "contraband or evidence of a crime" at both residences. *See Sanders*, 106 F.4th 461. For the reasons explained above, the Report did not err when it applied the known drug dealer inference. And even if the Report erroneously applied that inference, there was ample independent evidence supporting probable cause to search both residences.

10

## B. Even If There Was No Constitutionally Sufficient Probable Cause, The Good-Faith Exception Applies.

Finally, even if probable cause was lacking, the Good-Faith exception applies. The Fourth Amendment's text is "silent" on what remedy flows from an unlawful search. *United States v. Neal*, 106 F.4th 568, 571 (6th Cir 2024) (citation omitted). But "the exclusionary rule," exists as a "judicially crafted" remedy. *Sanders*, 106 F.4th at 467 (citations omitted). The exclusionary rule, however, does not apply "when officers conduct a search in good faith reliance on a judicially authorized warrant." *Sanders*, 106 F.4th at 468 (citing *United States v. Leon*, 468 U.S. 897, 909, 922 (1984)). That is so because the exclusionary rule's "sole purpose" is "deter[ing] police misconduct." *Id.* at 467 (citations omitted). Where an officer relies in good faith on an authorized warrant, "any error in the probable cause calculus [is] likely" not attributable to the officers, undermining "the grounds for exclusion based on misconduct." *Id.* at 468 (citations omitted). For the Good-Faith exception to apply, an affidavit must contain a "minimally sufficient nexus," or a "modicum of evidence, **however slight**, to connect the criminal activity" to the place law enforcement seeks to search. *See Neal*, 106 F.4th at 572 (emphasis added); *see also Sanders*, 106 F.4th at 469.

The Good-Faith exception "has its own exceptions." *Sanders*, 106 F.4th at 468. As pertinent here,[4] the Good-Faith exception does not apply where an officer relies on a "bare-bones affidavit" that is "so lacking in indicia of probable cause as to render official belief" that probable cause exists "entirely unreasonable." *Id.* (citation and quotation marks omitted). "[B]are-bones," or "skeletal," affidavits are those that are either "completely devoid of

---

[4] Defendant only challenges the Report's application of the Good-Faith exception on the grounds that the Affidavit was "bare-bones" [*See* Doc. 354 at 10-11].

11

any nexus between the illegal activity and the place to be searched," or those that "merely state[] suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id.* at 468-69 (citation and quotation marks omitted) (discussing examples). A "bare bones" affidavit "consist[s] of no more than a hunch that evidence might be found at a location." *Neal*, 106 F.4th at 572 (citation omitted). Indeed, "where it is simply ***debatable*** whether probable cause exists, an officer is justified in relying on a judicial finding of probable cause" *Id.* at 573 (citation omitted) (emphasis added).

Here, Defendants object to the Report's conclusion that the Good-Faith exception applies, arguing that the Affidavit in support of the search warrant of both residences was bare-bones [*See* Doc. 354 at 10-11]. This argument fails. Defendants acknowledge that "there is no dispute that" Defendants Vanriette and Evans "resided, at various times during the investigation, at the two houses" [Doc. 354 at 4]. The Affidavit here is not "completely devoid" of a probable cause nexus between Defendants illegal activity and the residences; nor is it premised merely on conclusory suspicions. *See Sanders*, 106 F.4th at 468-69. The evidence described above contained in the Affidavit—including, controlled drug purchases spanning over a year and totaling approximately 280 grams of illegal narcotics; agents following Defendant Evans directly back to the 128 Love Drive residence after one controlled buy; Defendants unloading bags into the 521 West Wheeler Street residence from underneath a car hood after manipulating the engine compartment with power tools multiple times; traveling from Michigan back to the 521 West Wheeler Street residence with "stronger shit" before purchasing items consistent with cutting drugs and bringing them back to the 521 West Wheeler street residence—does not resemble the "bare-bones" or "skeletal" affidavits that Sixth Circuit precedent condemns.

There was "more than a hunch" that officers would find contraband at both residences. *Neal*, 106 F.4th at 572. And even generously construing the facts in Defendants' favor, it was at worst "debatable whether probable cause exist[ed]." *Id.* at 573. Either way, law enforcement was "justified in relying on [the] judicial finding of probable cause" here. *Id.* At bottom, law enforcement observations; buttressed by Officer Mynatt's assertions based on his training, experience, and familiarity with the investigation; are enough to support probable cause as an original matter. But even if the evidence in the Affidavit fails to establish a sufficient probable cause nexus between Defendants' illegal activity and the residences, the Good-Faith exception properly applies.

### III. Conclusion

For the reasons above, the Court **OVERRULES** Defendant Vanriette's Objections to Report [Doc. 354]. Accordingly, the Court **ACCEPTS** and **ADOPTS** the Report. The Court therefore:

(1) **GRANTS** Defendant Vanriette's Motion to join in Defendant Evans's suppression motion [Doc. 260]; and

(2) **DENIES** Defendant Evans's "Motion to Suppress" [Doc. 245].

SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge

13